FILED

2015 OCT 26  PM 4: 09

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

CAVAN CARRUTH,

　　　　　　　　**Plaintiff,**

-vs-                                                              **Case No. A-15-CA-189-SS**

LOUIS MICHOT, ANDRE MICHOT, LOST
BAYOU RAMBLERS, LLC, and OTUT, LLC,
　　　　　　　　**Defendants.**

---

## O R D E R

　　BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Cavan Carruth's First Amended Complaint [#10], Defendants Louis Michot and Andre Michot's Rule 12 B Motion to Dismiss Due to Lack of Personal Jurisdiction and Improper Venue, or, Alternatively, to Transfer Pursuant to 28 U.S.C. § 1404 [#17], Defendants Lost Bayou Ramblers, LLC, and OTUT, LLC's motion for the same [#18]; Carruth's Response to Defendants Louis Michot and Andre Michot's Motion [#21]; Carruth's Response to Defendants Lost Bayou Ramblers, LLC, and OTUT, LLC's Motion [#27]; and Defendants Louis Michot, Andre Michot, Lost Bayou Ramblers, LLC, and OTUT, LLC's Reply [#32] in support.  Having reviewed the pleadings, the briefing of the parties, the relevant law, and the case file as a whole, the Court now enters the following opinion and orders.

　　This is a case brought by Plaintiff Cavan Carruth, a member of the *Lost Bayou Ramblers* (the Band), a Cajun-style musical group formed in Lafayette, Louisiana, against his former band members, Louis and Andre Michot (the Michots) and two limited liability companies, Lost Bayou

Ramblers, LLC (LBR), and OTUT, LLC (together, the LLCs), formed to manage the Band's affairs. Carruth alleges his bandmates improperly expelled him from the group and related business ventures in violation of the LBR operating agreement and deprived him of his rightful interest in the operations' income and assets. Carruth seeks to recover his interests in the Band and LLCs, a declaration of the parties' rights to co-authored musical compositions and recordings, and damages for breach of fiduciary duties and other allegedly tortious conduct. Carruth also seeks a court-ordered/supervised dissolution and winding up of LBR and OTUT.

The Michots and the LLCs filed separate motions seeking dismissal for lack of personal jurisdiction and improper venue, or, alternatively, transfer to the Western District of Louisiana, Lafayette Division. Carruth opposes the motions and seeks jurisdictional discovery if the pleadings are deemed insufficient to establish jurisdiction in this Court. For the reasons set forth below, the Court finds it has personal jurisdiction over the Michots but not the LLCs and transfers the case to the Western District of Louisiana, Lafayette Division based on a finding of convenience.

## Background

### I.  The Band's Inception

While Carruth and the Michots dispute the Band's origin,[1] it is undisputed Carruth was a member of the band from 2002 until 2004, when Carruth withdrew from the group and moved from Louisiana to Austin, Texas. Am. Compl. [#10] ¶ 11; Pl.'s Resp. [#21-1] Attachment 1 (Carruth Decl.) ¶ 7; Michots' Mot. Dismiss [#17-3] Ex. A (L. Michot Decl.) ¶ 13. Carruth reunited with the

---

[1] Carruth avers the Michots began performing in his group, *Li'l Enos and the Bayou Bandits*, in late 2001, after which the three began performing under the name *Lost Bayou Ramblers* in 2002. Carruth Decl. ¶ 5. The Michots insist Carruth is not a founding member of the Band. Rather, Louis Michot states he and his brother, Andre, formed the Band in 1999 and Carruth did not join until three years later, in 2002. L. Michot Decl. ¶ 3. By that time, the Band was well-established and had played numerous shows. Reply [#32-1] Attachment 1 (L. Michot Reply Decl.) ¶ 6.

Band in 2006, remaining an active touring and recording member until 2014, when the instant dispute arose. Am. Compl. [#10] ¶ 11. During this time, the band released four albums, one of which was nominated for a Grammy award. *Id.* Carruth has performed on six of the Band's seven commercially distributed albums. Carruth Decl. ¶ 18. Carruth lived in Austin for a total of eight-and-a-half years while performing with the Band. He currently lives in Austin.

The Band originally operated as a de facto partnership, sharing all profits and losses equally. Am. Compl. [#10] ¶ 15. In 2008, while Carruth was living in Austin, the Michots and Carruth formed LBR and OTUT. *Id.* ¶ 16. The purpose of LBR was to manage the Band and the purpose of OTUT was to administer the Band's publishing rights. *Id.* [#10] ¶ 17. At the time of its formation, Carruth and the Michots also entered into a publishing agreement with OTUT. Carruth Decl. ¶ 10. LBR and OTUT are both Louisiana limited liability companies with their principal places of business in Broussard, Louisiana. Am. Compl. [#10] ¶ 2. Carruth and the Michots are the only members of LBR and LBR is the sole member of OTUT. *Id.* ¶ 18.

## II.    The Band's Texas Ties

In addition to performing, Carruth spearheaded a number of the Band's business ventures from his home in Austin. Carruth alleges he co-managed the Band's bookings and contract negotiations, all sales and distribution of the Band's merchandise, the creation and management of the Band's social media outlets, and the maintenance of the Band's tour van. *Id.* [#10] ¶ 12. Carruth claims responsibility for managing the Band's online store and shipping all merchandise orders placed on the Band's website from Austin, as well as developing a relationship with Austin retail outlets, such as Waterloo Records. Carruth Decl. ¶ 13. Pursuant to the LBR operating agreement,

Carruth earned extra "points" from the Band's earnings in return for his management endeavors. *Id.* ¶ 14.

The Band also had a number of ties to Texas. Although all seven albums were recorded in Louisiana, the Band held strategy meetings and produced and mastered three albums in Austin. *Id.* ¶¶ 12, 17; L. Michot Reply Decl. ¶ 29. From 2011 to 2012, two Austin residents performed with the Band in addition to Carruth. Am. Compl. [#10] ¶ 14. Finally, the Band performed more than twenty shows in the state of Texas between 2002 and 2014, including at least ten shows in the Austin area. *Id.* ¶ 14; Carruth Decl. ¶ 16. According to Carruth's pleadings, the Michots have earned at least $500,000 in Band-related revenue, a significant portion of which was earned in Texas.[2]

## III.   Carruth's Ouster

In 2014, the relationship between Carruth and the Michots soured. Carruth accuses Louis Michot of a series of misrepresentations and omissions evidencing Louis's attempt to usurp power over the Band by making unilateral management decisions and incurring debt without consulting his brother and Carruth. Am. Compl. [#10] ¶¶ 21–24; Carruth Decl. ¶¶ 20(a),(b). Carruth also accuses Louis of taking an unauthorized payment of $8,000 out of LBR's account. Carruth Decl. ¶ 20(c). The Michots dispute these accusations, and instead cite Carruth's negative attitude and constant dissent as creating an irreparable fissure among the group members.

In August 20, 2014, after approximately six months of discord, the Michots sent an email notifying Carruth they had voted to remove him as a member of LBR pursuant to the terms of the

---

[2] The parties dispute to what extent the Band's revenue was connected to business activities in Texas. According to Carruth, the band was deriving 10–12% of its total earnings from Texas in 2014. Carruth Decl. ¶ 15. While the Michots claim this estimate does not reflect their records, the Court must "resolve any factual conflicts in favor of the plaintiff." *Alpine View*, 205 F.3d at 215.

LBR operating agreement.  Am. Compl. [#10] ¶ 25; Carruth Decl. ¶ 21; Pl.'s Resp. [#21-10] Ex. I (Michots Email).  The email invited Carruth to continue to perform with the Band as a guitarist but "not as an LLC member."  Michots Email at 2.  According to Louis, Carruth "accepted the offer" to remain a member of the Band, playing two shows with the group in California.  L. Michot Reply Decl. ¶ 15.  However, upon returning to Louisiana, Carruth requested time to contemplate his decision and has not performed with the Band since.  *Id.*

In September 2014, Carruth sought a buy-out of his interest in the LLCs and the Band.  Am. Compl. [#10] ¶ 27.  Carruth also requested an accounting and asserted his interest in the Band, LBR, and all revenues flowing therefrom.  *Id.*  Around the same time, Louis traveled to Austin to repossess the Band's tour van.  Carruth Decl. ¶ 22.  On October 16, 2014, the Michots obtained a Louisiana trademark "Lost Bayou Ramblers" in their own names.[3]  *Id.*  On October 27, 2014, the Michots told Carruth he was "due no money."  *Id.*

On February 2, 2015, the Michots informed Carruth they had formed Calaire Cote, LLC, a new entity which would receive all revenue from performances and merchandise sales.  *Id.*; L. Michot Reply Decl. ¶ 36.  Carruth presumed this revenue included sales of the six albums featuring his recorded performances and his co-written musical compositions. Am. Compl. [#10] ¶ 28. According to Carruth, the Michots never provided him with an accounting, never paid him his share of the earnings from the Band and its related business, and never compensated him for his interest in the Band and its assets.  *Id.*; Carruth Decl. ¶ 22.

---

[3]  The Michots filed for a United States trademark on the Band's name on March 31, 2015.  Michots' Mot. Dismiss [#17] at 4.

IV.    **Legal Action**

On March 16, 2015, Carruth filed the instant suit in the Western District of Texas seeking (a) a declaration of the parties' rights in co-authored musical compositions and sound recordings, (b) a declaration concerning the parties' rights and liabilities in connection with their relationship as members of the Band and as members of LBR, (c) damages for breach of the LBR and OTUT operating agreements and for breach of fiduciary duties arising from his unlawful removal from LBR, (d) damages for conversion, misappropriation, unjust enrichment, and constructive fraud, and (e) a judicial dissolution of LBR and OTUT and an accounting, claiming the Michots wrongfully withheld over $500,000 from him.   Carruth also seeks reasonable attorney's fees. The original complaint did not name the LLCs as defendants.

On April 2, 2015, the Michots filed suit in Louisiana state court seeking substantially similar declaratory relief and a judicial dissolution of the two LLCs.  *See* LLCs' Mot. Dismiss [#18-4] Ex. C.  On June 22, 2015, the state court action was stayed pending resolution of Carruth's federal action.

On April 29, 2015, Carruth amended his complaint to name LBR and OTUT as party-defendants.[4]  Am. Compl. [#10].  On May 18, 2015, the Michots filed their motion to dismiss for lack of personal jurisdiction and improper venue, or alternatively, to transfer the case based on forum non conveniens.  *See* Michots' Mot. Dismiss [#17].  On May 27, 2015, the LLCs filed a separate

---

[4] Carruth served the Amended Complaint on himself, as statutory agent of LBR and OTUT, rather than on the Michots, the LLCs registered agents.  Although they believe this is "obviously improper," Defendants have waived their objections to the improper service "in order to permit the Court to immediately address the more substantive issues." LLCs' Mot. Dismiss [#18] at 3–4.

motion seeking substantially similar relief. *See* LLCs' Mot. Dismiss [#18]. The Michots' and the LLCs' motions have been fully briefed and are now ripe for consideration.

**Analysis**

**I.      Motion to Dismiss—Personal Jurisdiction**

**A.      Legal Standard**

The Federal Rules of Civil Procedure allow a defendant to assert lack of personal jurisdiction as a defense to suit. FED. R. CIV. P. 12(b)(2). To determine whether a federal district court has personal jurisdiction over a nonresident defendant, the district court considers first whether exercising jurisdiction over the defendant comports with due process. *Religious Tech. Ctr. v Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003). If the requirements of due process are satisfied, the court then determines whether the exercise of jurisdiction is authorized by the jurisdictional "long-arm" statute of the state in which the court sits. *Id.* Because the Texas long-arm statute has been interpreted as extending to the limit of due process, the two inquiries are the same for district courts in Texas. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE §§ 17.001–.093.

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). One requirement of due process is that the nonresident defendant be properly subject to the personal jurisdiction of the court in which the defendant is sued. *Id.*

The United States Supreme Court has articulated a two-pronged test to determine whether a federal court may properly exercise jurisdiction over a nonresident defendant: (1) the nonresident must have minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction

must be consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004).

A defendant's "minimum contacts" may give rise to either specific personal jurisdiction or general personal jurisdiction, depending on the nature of the suit and the defendant's relationship to the forum state. *Freudensprung*, 379 F.3d at 343. "A court may exercise specific jurisdiction when (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state." *Id.* Even when the controversy is not related to the defendant's contacts with the forum state, however, a court may nevertheless exercise general jurisdiction over the defendant if the defendant has engaged in "continuous and systematic contacts" in the forum. *Id.* Of course, if a defendant satisfies neither of these tests, the exercise of personal jurisdiction is not proper. *Int'l Shoe*, 326 U.S. at 316.

The plaintiff has the burden of making a prima facie case by showing a defendant has sufficient "minimum contacts" with the forum state to justify the state's exercise of either specific or general jurisdiction. *Freudensprung*, 379 F.3d at 343. If the plaintiff does so, the burden shifts to the defendant to show such an exercise offends due process because it is not consistent with traditional notions of fair play and substantial justice. *Id.* Finally, when a court rules on a 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept the non-moving party's jurisdictional allegations as true and resolve all factual disputes in its favor. *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999).

**B.** **Application**

    **i.** **The Michots**

Carruth contends the Michots have sufficient contacts with Texas to support either general or specific jurisdiction. To establish jurisdiction, Carruth points to the ongoing business relationship between Louis Michot, Andre Michot, and himself as (1) members of the Band, which he claims operated as a de facto partnership, and (2) members of LBR and OTUT. *See* Carruth Decl. ¶¶ 7–19. Carruth suggests his activities in Texas on behalf of the Band must also be attributed to the Michots, as members of the de facto partnership. Alternatively, Carruth claims specific jurisdiction is warranted pursuant to the "effects test" described in *Calder v. Jones*, 465 U.S. 783 (1984), as the Michots intentionally directed tortious activity toward Carruth in Texas.[5] *See* Resp. [#21] at 7. In response, the Michots argue they do not have "continuous and systematic" ties with Texas justifying general jurisdiction and Carruth has failed to establish a prima facie case of specific jurisdiction because he has not identified which of their forum-related activities give rise to his claims. *See* Michots' Mot. Dismiss [#17] at 6–8.

To the extent Carruth suggests his own business activities in Texas on behalf of the Band, operating as a de facto partnership, may be imputed to the Michots for purposes of the minimum contacts analysis, the Court disagrees. *See, e.g.*, *Sher v. Johnson*, 911 F.2d 1357, 1365–66 (9th Cir. 1990) ("[A] partner's actions may be imputed to the partnership for the purpose of establishing minimum contacts, but ordinarily may not be imputed to the other partners."). Similarly, Carruth cannot rely on his own conduct in Texas to establish personal jurisdiction over the Michots. While

---

[5] The Michots do not address this theory in their brief. Having found the Michots purposefully availed themselves of the benefits and protections of the forum state, the Court need not address the *Calder* effects test.

a defendant's relationship with the plaintiff or a third party may be a significant factor in evaluating ties to the forum, *see Rush v. Savchuck*, 444 U.S. 320, 332 (1980), the constitution requires the court look to the contacts the "defendant *himself*" establishes with the forum State and not the "unilateral activity of another party or a third person" with whom the defendant is associated.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State.").  Instead, the Court looks to whether the Michots themselves "'deliberately' ha[ve] engaged in significant activities within the State, or ha[ve] created 'continuing obligations' between [themselves] and residents of the forum . . . ." *Burger King*, 471 U.S. at 475 (internal citations omitted).

Ignoring Carruth's activities on behalf of the Band, it is clear the Michots have not engaged in "continuous and systematic" activity in Texas so as to justify general jurisdiction.  The Michots are now and have at all relevant times been residents of Louisiana; there is no evidence Louis or Andres Michot have ever lived in Texas, been employed in Texas, owned real estate in Texas, traveled to Texas for recreation, or transacted any business in Texas unrelated to their activities with the Band.  *Cf. Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir. 1986) (finding an individual nonresident defendant subject to general jurisdiction in Texas where, *in toto*, his contacts evidenced "constant and extensive personal business connections with Texas throughout [the nonresident defendant's] adult life.").  It cannot seriously be argued the Michots are constructively present in Texas so as to justify them being required to answer in a Texas court in "*any* litigation

arising out of *any* transaction or occurrence taking place *anywhere* in the world." *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003).

In contrast, Carruth has satisfied his burden of establishing specific jurisdiction; the Michots purposefully directed their activities toward Texas and the controversy arises out of and is related to their activity in Texas. *See Freudensprung*, 379 F.3d at 343.  Beginning in 2006, the Michots deliberately reached out to Texas to create an ongoing artistic and business relationship with Carruth involving the production, recording, and performance of music, the promotion of the Band as a business entity, and the formation of and membership in the LLCs.[6]  The present dispute arises out of and is directly related to this ongoing relationship.  The sum of Carruth's claims are for a declaration of the parties' rights and interests in the Band's musical compositions, recordings, mark, and income earned therefrom, and for damages relating to his eviction from the partnership and the LLCs and the Michot's appropriation of assets he believes partially belong to him.  In essence, Carruth seeks his rightful share of the financial benefits from the group's musical collaboration—an eight-year-long partnership founded with an understanding Carruth would live in Texas and hence that the relationship would cross state lines.

Having deliberately engaged in significant activities in Texas, and having created continuing obligations between themselves and Carruth, a Texas resident, it is presumptively reasonable the Michots could anticipate being haled into Court in Texas to answer for Carruth's expulsion from their musical enterprise. *See World-Wide Volkswagen*, 444 U.S. at 295; *Burger King*, 471 U.S. at

---

[6] It is undisputed the Michots made numerous physical encroachments into the state as part of their relationship with Carruth. For example, the Michots traveled to Texas to perform, produce and master compositions and recordings, and to hold business meetings related to the Band. *See, e.g.*, Carruth Decl. ¶¶ 12, 16, 17.  The Michots also directed numerous communications to Carruth in the State. *See, e.g., id.* ¶¶ 9, 19; *see also* Resp. [#21-7–8] Exs. E, F.

473–74 ("Moreover, where individuals 'purposefully derive benefit' from their interstate activities . . . it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities.").

Having found Carruth has established a prima facie case of specific jurisdiction, the "burden shifts to the defendant to show the assertion of jurisdiction would be unfair." *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999). The Michots may prove jurisdiction does not comport with "fair play and substantial justice" based on the following factors: "(1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies." *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). "It is rare to say the assertion is unfair after minimum contacts have been shown." *Wien Air*, 195 F.3d at 213.

Based on the foregoing, the exercise of jurisdiction over the Michots would not be unfair. The Michots, who currently reside in Louisiana, would not be unreasonably inconvenienced by defending this action in their neighboring state. Texas also has a significant interest in providing a forum to address the claims of its aggrieved residents. The Michots do not appear to argue that this matter is the "rare" and "compelling" case where the assertion of personal jurisdiction would be unfair despite the satisfaction of minimum contacts. *See id.* at 215. Consequently, the Court finds it has specific jurisdiction over the Michots and the Michots' motion to dismiss based on lack of personal jurisdiction is DENIED.

### ii.     The LLCs

Carruth advances two reasons in support of the Court's exercise of either general or specific jurisdiction over the LLCs. First, Carruth suggests that because he is a member of LBR, which is

in turn the sole member of OTUT, his residency in Texas means both companies must also be "at home" in Texas for purposes of determining general personal jurisdiction. Carruth bases this argument on *Harvey v. Grey Wolf Drilling*, 542 F.3d 1077 (5th Cir. 2008), in which the Fifth Circuit held limited liability companies are considered "citizens" of the states of their members for purposes of determining diversity jurisdiction. Second, Carruth contends the LLCs have conducted sufficient business activity within Texas to warrant jurisdiction.

Carruth's first argument lacks merit as it blurs principles of diversity jurisdiction and minimum contacts and ignores the Supreme Court's prohibition on "talismanic jurisdictional formulas." *Burger King*, 471 U.S. at 486; *see also Kulko v. Cal. Superior Court*, 436 U.S. 84, 92 (1978). A determination of citizenship for diversity jurisdiction and a determination of minimum contacts for personal jurisdiction "present[] distinct due process issues." *See Mountain Funding, LLC v. Blackwater Crossing, LLC*, No. 3:05-cv-513-MU, 2006 WL 1582403, at *3 (W.D.N.C. June 5, 2006); *King v. Hawgwild Air, LLC*, No. 3:08-cv-0153-L, 2008 WL 2620099, at *5 (N.D. Tex. June 27, 2008) (citing *Mountain Funding*). Indeed, the personal jurisdiction analysis is founded on an evaluation of whether *each* defendant purposefully availed him or herself of the benefits and protections of the forum state. *See Burger King*, 471 U.S. at 476. Disregarding a defendant's corporate form and looking directly to the citizenship of an limited liability company's members ignores this directive. Consequently, the Court may not exercise general personal jurisdiction over LBR based solely on the citizenship of one of its members. Rather, the Court must decide whether LBR or OTUT have sufficient contacts with the state of Texas to support the exercise of personal jurisdiction.

Carruth's second argument also fails; Carruth has not met his burden of establishing a prima facie case of personal jurisdiction as to either of the LLCs. It is undisputed the LLCs are both

Louisiana limited liability companies, organized under and governed by the laws of the state of Louisiana. The LLCs' operating agreements were entered into in Louisiana and the addresses for their registered agents are located in Louisiana. The LLCs have never sought authority to do business in Texas, have never held a bank account in Texas, and have no offices or employees in Texas. *See* LLCs' Mot. Dismiss [#18-2] Ex. A (A. Michot Decl.) ¶¶ 6–10. Other than the publishing agreement referenced below, Carruth has not presented evidence of any contracts, agreements, communications or other materials evidencing any connection between the LLCs and the state of Texas. Consequently, Carruth has failed to make a prima facie case showing the LLCs' "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011)).

Carruth argues his own activities managing the Band in Texas on behalf of LBR and publicizing and promoting the Band's catalogue on behalf of OTUT are sufficient contacts to subject the LLCs to general personal jurisdiction in the State.[7] Plaintiff characterizes his activity in Texas on behalf of the Band as being conducted from the LLCs' "Texas office." *See* Resp. [#7] at 5. The LLCs dispute the extent to which Carruth's contacts with Texas may be attributed to the LLCs, arguing his activities on behalf of the Band were his "own personal activities." *See* Reply [#32] at 6. Defendants have the better argument. Other than a self-serving declaration and creative briefing, there is insufficient evidence before the Court establishing Carruth's management or promotional efforts were conducted in his capacity as a representative or agent of LBR or OTUT as opposed to

---

[7] Carruth claims, pursuant to the LBR agreement, he engaged in the following activities in Texas on behalf of the LBR: (1) managing the Band's social media accounts; (2) processing and shipping merchandise orders from the Band's website; (3) handling contract negotiations with Texas residents; (4) managing Austin retail outlets; (5) recruiting and hiring musicians, producers, mixers, mastering engineers, and graphic designers; (6) garaging and maintaining the Band's touring vehicle; and (7) handling press and publicity. *See* Carruth Decl. ¶ 13.

in his capacity as a representative of the Band or in his individual capacity.  Absent such evidence, Carruth's contacts with the State cannot qualify as the contacts of LBR or OTUT.

Even if there was a basis for attributing Carruth's contacts to the LLCs, such contacts would still not make LBR or OTUT "at home" in Texas considering the LLCs' considerably more substantial connection to Louisiana.  *See Daimler AG*, 134 S.Ct. at 762 n.20 ("General jurisdiction calls for an appraisal of a corporation's activities in their entirety, nationwide, and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them.").[8]

The only meaningful evidence of a link between either of the LLCs and Texas is a publishing agreement between OTUT and Carruth.  *See* Resp. [#21-1] Ex. A.  Pursuant to this publishing agreement, Carruth agreed to exchange his interest in compositions from two existing albums and any future compositions for OTUT's agreement to administer the works, render accountings, and pay certain royalties.  *See id.*  Even assuming this contract, standing alone, could establish minimum contacts, there is no allegation of injury "aris[ing] out of or [relat]ing to" the publishing agreement. *See Burger King*, 471 U.S. at 472.  Indeed, there is no allegation of wrongdoing by OTUT related to this contract whatsoever.  Consequently, this contract cannot be the basis for supporting a prima facie case of specific jurisdiction.

---

[8] Carruth does not appear to argue his contacts in the state can support specific jurisdiction over the LLCs. *See* Resp. [#27] at 6.  Rather, Carruth again implicates the *Calder* effects test to argue that because the Michots aimed allegedly tortious activity towards Carruth in Texas in their capacity as members of LBR, such contacts should be imputed to the LLCs.  As above, however, there is no evidence suggesting any of the Michots' conduct was taken as representatives or agents of LBR or OTUT as opposed to as representatives of the Band or in their individual capacities. *See Dunn v. A/S Em. Z. Svitzer*, 885 F. Supp. 980, 985 (S.D. Tex. 1995) (citing *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 469 (1st Cir. 1990)) (holding a joint venture member's activities in a forum state may only be imputed to the joint venture where (a) the member's activities were related to the joint venture's business and (b) the other members or the association itself had exercised substantial influence over the member's decision to carry on those activities); *see also Flores v. A.C., Inc.*, No. EP-02-CA-0200-DB, 2003 WL 1566507, at *7 (W.D. Tex. Mar. 15, 2003 ) (noting the actions of an agent may be attributed to the principal for purposes of jurisdiction, but holding an agency relationship cannot be presumed to exist but must be established).  Consequently, Carruth's argument based on this theory must also fail.

Because Carruth has failed to satisfy his burden of making a prima facie case of general or specific jurisdiction over LBR or OTUT, the LLCs' motion to dismiss is GRANTED.[9]

## III.    Motion to Transfer Venue

The Michots seek to transfer this case to the United States District Court for the Western District of Louisiana, Lafayette Division.[10]

### A.    Legal Standard

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)). "There can be no question but that the district courts have broad discretion in deciding whether to order a transfer" under § 1404(a). *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 313–15 (5th Cir. 2008).

The preliminary question in a motion for transfer of venue is whether the suit could have been filed originally in the destination venue. *Id.* at 312. After determining the suit could have been

---

[9] Carruth argues he is entitled to jurisdictional discovery because "Defendants have refused to produce books and records which would help [him] establish jurisdictional facts . . . related to the parties' contacts." Resp. [#21] at 14. While Defendants may be in possession of materials not readily at Carruth's disposal, Carruth has not explained how this material would demonstrate whether OTUT or LBR have any additional contacts with Texas or how his claims would arise out of such contacts. Among other things, Carruth does not claim Defendants are in possession of materials that would satisfy his burden of proving his activities in Texas were taken on behalf of LBR or OTUT. As a result, Carruth has not shown with adequate specificity how his requested discovery is likely to establish jurisdiction over the LLCs, and the Court denies his discovery request. *See Monkton Ins. Servs. v. Ritter*, 768 F.3d 429, 434 (5th Cir. 2014).

[10] Having found personal jurisdiction over the Michots, the court concludes venue is also proper in this district. *See* 28 U.S.C. § 1400(a); *see also Asevendo v. NBCUniversal Media, LLC*, 921 F. Supp. 2d 573, 590 (E.D. La. 2013) ("Courts have held than an individual defendant 'may be found' in a district where he is subject to personal jurisdiction."). The parties do not appear to argue dismissal is proper under either 28 U.S.C. § 1404 or forum non conveniens and consequently the Court does not address this issue.

filed in the destination venue, the Court must next focus on whether the party requesting the transfer has demonstrated the "convenience of parties and witnesses" requires transfer of the action, considering various private and public interests. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1974).[11]

The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* Although the *Gilbert* factors are "appropriate for most transfer cases, they are not necessarily exhaustive or exclusive"; indeed, the Fifth Circuit has noted "'none . . . can be said to be of dispositive weight.'" *In re Volkswagen of Am.*, 545 F.3d at 313–15 (quoting *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004)). Despite the wide array of private and public concerns, a court must engage in a "flexible and individualized analysis" in ruling on a motion to transfer venue. *Stewart*, 487 U.S. at 29.

Though the above is similar to the standard in the forum non conveniens context, § 1404(a) requires a lesser showing of inconvenience. *In re Volkswagen of Am.*, 545 F.3d at 314. As such, the movant need not show the *Gilbert* factors *substantially* outweigh the plaintiff's choice of venue—it

---

[11]Although *Gilbert* dealt with forum non conveniens, the Fifth Circuit applies the "*Gilbert* factors" in the § 1404(a) context. *See In re Volkswagen of Am.*, 545 F.3d at 314 n.9.

is enough to show the new venue is clearly more convenient than the original one. *See id.* Nonetheless, as the Supreme Court has cautioned, while the movant's burden is lessened, the plaintiff's choice of venue is still to be considered. *See Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955). Accordingly, the Fifth Circuit's rule is that while the plaintiff's choice of venue is not a factor under *Gilbert*, it places a "significant" burden of proof upon the movant to "show good cause for the transfer." *In re Volkswagen of Am.*, 545 F.3d at 314 n.10. "Thus, when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Id.* at 315.

## B.    Application

As an initial matter, this case could have been brought in federal court in Louisiana. The Western District of Louisiana, where the Michots reside, is "a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred," and venue is therefore proper in that district. 28 U.S.C. § 1391(b)(2). Alternatively, venue is proper in the Western District of Louisiana for purposes of the federal copyright claims because the Michots "reside[] or may be found" in that district. 28 U.S.C. § 1400(a). As residents of the state, there can be no dispute the Michots are subject to personal jurisdiction in Louisiana. Because this action could have been brought in Louisiana, the Court turns to an analysis of the *Gilbert* factors.

The private factors favor transfer. First, access to sources of proof will be more expedient in Louisiana. The Fifth Circuit has cautioned this factor remains relevant despite technological advances having made electronic document production commonplace. *In re Volkswagen of Am.*, 454 F.3d at 316. Considering Carruth's allegation the Michots are in possession of the Band's and LLCs' books and records, it is likely most of the relevant documents concerning the group's finances will

be located in Louisiana, where the Michots reside.  Similarly, it is undisputed the Band was formed in Louisiana, the LLC operating agreements were executed in Louisiana, and the allegedly wrongful acts took place in Louisiana.  Consequently, it is more likely relevant physical evidence will be located in Louisiana than Texas, and thus this factor weighs in favor of transfer.

The second private interest factor is the availability of compulsory process to secure the attendance of witnesses.  Federal Rule of Civil Procedure 45 permits a Court to command a person to attend trial, hearing or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business" or "within the state where the person resides, is employed, or regularly transacts business if . . . the person is commanded to attend a trial and would not incur substantial expense."  FED. R. CIV. P. 45(c)(1)(A)-(B).  Because party witnesses do not typically require compulsory process, the Court focuses on non-party witnesses.  As discussed below, a majority of the material non-party witnesses in this case reside in Louisiana, outside of this Court's compulsory subpoena power and within the transferee court's subpoena power.  Even though transfer will leave some of the Texas witnesses outside of the Louisiana forum's subpoena power, there is no evidence any of the Texas witnesses will be unwilling to travel to Louisiana to testify if asked to do so.  Consequently, the relative importance of the witnesses in Louisiana suggests this factor weighs slightly in favor of transfer.  *See In re Volkswagen of Am.*, 545 F.3d at 316.

The third private factor, the cost of attendance for willing witnesses, has been recognized as "the most important factor under § 1404."  *Bascom v. Maxim Integrated Prods., Inc.*, 534 F. Supp. 2d 700, 704 (W.D. Tex. 2008).  "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled."  *In re Volkswagen*

*AG*, 371 F.3d at 204–05.  Further, "it is more convenient for witnesses to testify at home and that '[a]dditional distance means travel time; additional travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which these fact witnesses must stay away from their regular employment." *In re Volkswagen of Am.*, 545 F.3d at 317 (quoting *In re Volkswagen AG*, 371 F.3d at 205).

The majority of the case's witnesses will likely be found in Louisiana.  The primary issues in this case involve the formation and naming of the Band, Carruth's participation in the Band, the ownership of the Band's name, recordings, and compositions, the formation of LBR and OTUT, and Carruth's dismissal and removal from the Band and LBR.  Both parties have submitted a list of approximately thirty non-party witnesses living in their respective districts they argue will provide material testimony in support of their positions.  Apart from Paul Etheredge and Andrew Thomas Austin-Peterson, two Austin-based musicians who performed with the band after 2010, and Chris "Frenchie" Smith and Jerry Tubb, two Austin-based industry professionals who had a continuing relationship with the Band, the bulk of Carruth's proposed third-party witnesses can only attest to the Band's connections in Texas.  Indeed, all of the remaining twenty-nine witnesses included in Carruth's list have firsthand knowledge of the Band's promotion, performance, and income in Texas but do not appear to have a personal relationship with the Band members or to know about the Band's formation, business arrangements, or dissolution.  While the Band's activity in Texas may be relevant to the jurisdictional analysis, it does not pertain to the ultimate issues in the case.

In contrast, the witnesses proposed by the Michots can attest to the Band's formation, Carruth's involvement during the Band's nascency, the creation and formation of LBR and OTUT, and many of the Band's recordings and business activities.  Considering most of the material

witnesses reside in Louisiana, it cannot be denied that trying the case in Louisiana will reduce the cost of attendance for these witnesses and favors transfer to Louisiana.

The parties have not identified any other practical problems distinct from the facts considered under other factors. The Court holds the fourth private factor is neutral.

The Court now turns to the public interest factors. The first factor considers the relative congestion of the courts in both districts. Neither party has presented any evidence or argument as to unique administrative difficulties flowing from court congestion in either district. While this factor is speculative, it appears the Western District of Louisiana is less congested and therefore will be able to bring this case to trial faster. *See Frito–Lay N. Am. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012). The total case filings per judge in the Western District of Texas in 2014 was 904, making it the third busiest of the 94 districts in the country. The Austin Division of the District is exceedingly busy. In 2014, the two district judges had nearly 550 civil cases filed along with another 200 criminal cases. Weighing the cases for complexity, the average weighted docke for district judges in the Austin division in 2014 was 862 cases, more than one-and-a-half times larger than the national average weighted docket of 527 cases. The weighted average per judge for 2014 in the Western District of Louisiana was 374 cases, more than 480 cases lower than the Austin judges' weighted dockets.[12] Because the Austin Division of the Western District of Texas is more congested than the Western District of Louisiana, this factor favors transfer.

The second factor considers the local interests in having localized interests decided at home. This factor requires the Court weigh each locality's factual connection to the events giving rise to

---

[12] The statistics cited in the text all come from the statistical reporting contained on the United States Courts' webpage and can be found here: http://www.uscourts.gov/statistics-reports.

the action and the district's corresponding interests in the adjudicating the proceeding. *See In re Volkswagen AG*, 371 F.3d at 206.  Transfer is proper where none of the relevant facts occurred in the division and where residents in the division are not connected to or affected by the events that gave rise to the suit. *See In re Volkswagen of Am.*, 545 F.3d at 318.  While Texas undoubtedly has a interest in providing a forum for the redress of its resident's grievance, this case is much more closely connected with the Western District of Louisiana.  The Band was formed in Louisiana, the relevant compositions were recorded in Louisiana, the Michots both reside in Louisiana, and LBR and OTUT are Louisiana limited liability companies.  Further, the LBR and OTUT operating agreements were executed in Louisiana and are governed by Louisiana law.  Other than the repossession of the Band's touring vehicle from its garage in Austin, all of the alleged torts were committed in Louisiana.  Because the facts giving rise to the action occurred almost exclusively in Louisiana, and because Carruth fails to explain exactly what interest the citizens of Austin have in this case, this factor weighs in favor of transfer.

Finally, the third and fourth factors involve the familiarity of the forum with the law that will govern the case and the avoidance of unnecessary conflict of laws.  Carruth raises federal copyright and trademark claims and pendent state law claims for breach of contract, judicial dissolution, accounting, and various other torts. Am. Compl. [#10] ¶¶ 7–8.  As to the federal claims, these two factors are both neutral: federal law can be applied equally in either the Western District of Texas or the Western District of Louisiana.  As to the pendent state law claims, Carruth does not specify in his pleadings whether Texas or Louisiana law governs and the parties offer no argument regarding the applicable law in their respective briefs.  Rather, the Michots hastily conclude the dispute would be governed by Louisiana law.  With respect to the LBR and OTUT operating agreements, which

are expressly governed by Louisiana law, the Michots are likely correct. However, it is entirely unclear which law would govern the various tort claims. Because either court will need to undertake this inquiry, and because the only two choices are the respective forums themselves, this factor is neutral as to the tort claims. *See 360 Mortg. Grp., LLC v. Stonegate Mortg. Corp.*, No. A-13-CA-942-SS, 2014 WL 2092496, at *8 (W.D. Tex. May 19, 2014). In totality, because the claims arising out of the LLCs' operating agreements are governed by Louisiana law, this factor slightly favors transfer.

Weighing all of these factors, the Court finds the Western District of Louisiana, Lafayette Division is clearly the more convenient forum and therefore transfer is appropriate. *See In re Volkswagen of Am.*, 545 F.3d at 314 n.10. While Carruth was allegedly been harmed in Texas, mostly all of the allegedly harmful activity occurred in Louisiana and mostly all of the material witnesses reside in that state. The Band, LBR and OTUT were formed in Louisiana and apparently were dissolved unilaterally by the Michots in Louisiana. A Louisiana court should resolve this dispute. Therefore, the Court GRANTS the Michots' motion to transfer.

### Conclusion

Accordingly,

IT IS ORDERED that Defendants Andre Michot and Louis Michot's Rule 12 B Motion to Dismiss Due to Lack of Personal Jurisdiction and Improper Venue, or, Alternatively, to Transfer Pursuant to 28 U.S.C. § 1404 [#17] is GRANTED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that Defendants Lost Bayou Ramblers, LLC and OTUT, LLC's Rule 12 B Motion to Dismiss Due to Lack of Personal Jurisdiction and Improper Venue, or, Alternatively, to Transfer Pursuant to 28 U.S.C. § 1404 [#18] is GRANTED;

IT IS FURTHER ORDERED that all claims against Defendants Lost Bayou Ramblers, LLC and OTUT, LLC are DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction;

IT IS FINALLY ORDERED that this case is TRANSFERRED to the United States District Court for the Western District of Louisiana, Lafayette Division.

SIGNED this the 26ᵗʰ day of October 2015.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE